**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANDREW FULLMAN,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **CITY OF PHILADELPHIA,** *et al.*, | **NO.  24-0969** |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiff Andrew Fullman, proceeding *pro se*, brings this civil rights action against the City of Philadelphia ("the City") and the following municipal officials, all in their individual capacities: Assistant District Attorney Barbara McDermott ("ADA McDermott"), Officer Johnnie Mae Carter ("Officer Carter"), Officer William Dorney ("Officer Dorney"), and a Philadelphia Police Department Supervisor who he identifies not by name but with the placeholder, "John Doe".  Fullman asserts claims under 42 U.S.C. § 1983 for denial of due process, malicious prosecution, fabrication of false evidence, supervisory liability, failure to intervene, conspiracy to deprive him of constitutional rights, and municipal liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  He also brings claims under Pennsylvania law for negligent supervision, *respondeat superior* liability, intentional infliction of emotional distress, and negligent infliction of emotional distress.

The City, on behalf of itself and all other identified Defendants, moves to dismiss Fullman's Second Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the City's Motion will be granted in part and denied in part.

1

I. **BACKGROUND**

    A. **Factual Background**

The following factual recitation is taken from Fullman's Second Amended Complaint, well-pleaded allegations from which are taken as true at this stage. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

On October 4, 1986, Officer Carter responded to a report of a disturbance on Cobbs Creek Parkway in Philadelphia that involved Fullman and another individual, Bruce Beatty. At the scene, Beatty initially informed Officer Carter "that he began striking Fullman's car with a baseball bat" and, in response, Fullman "displayed a silver handgun." No one was arrested immediately thereafter. Instead, an investigation led by Officer Dorney ensued, during which Officer Dorney took statements from, among others, Fullman and Beatty. While Fullman steadfastly maintained his innocence, Beatty implicated Fullman and accused him of firing the silver handgun during the altercation. Following these meetings, Officer Dorney drafted reports to document the various statements made by the witnesses, which "definitively identified Mr. Fullman as the shooter." Officer Dorney also, Fullman says, directed Officer Carter to fabricate evidence—specifically, that Officer Carter observed a "fresh" bullet mark at the crime scene—to corroborate Beatty's statements about Fullman's use of the silver handgun. Fullman avers that "[a]ccording to Defendant Dorney, the case he built against Mr. Fullman depended entirely on Defendant Carter's false and fabricated claim of observing an alleged 'fresh' bullet mark" at the crime scene.

Officer Dorney eventually filed an Affidavit of Probable Cause and Fullman was arrested on November 8, 1986. At the Preliminary Hearing, Beatty took the stand and testified that he saw a bullet mark on the sidewalk of the crime scene following the incident. Shortly thereafter, he alleges that Officer Dorney had a change of heart and told Fullman "that he was going to talk

to the prosecutor" overseeing the trial and tell that individual "he did not believe Mr. Fullman fired a shot" during the altercation with Beatty.  Officer Dorney reneged on his offer, however, when Officer Carter—who was "an alleged friend of the Beatty family"—"conspired and pressured" other officers "to have Mr. Fullman arrested two additional times on fabricated gun charges" in an effort "to portray him . . . as a dangerous person."  Although the Philadelphia Municipal Court eventually dismissed those two "fabricated gun charges," the charges related to the Cobbs Creek Parkway incident with Beatty were sustained and Fullman began preparing for trial.

In the ensuing months, Officer Dorney renewed his instructions to Officer Carter that she fabricate evidence and provide false testimony against Fullman.  For instance, several days before Fullman's trial was scheduled to commence, Officer Dorney attempted to find an additional witness to falsely testify about where Fullman's car was in the days following the incident.  ADA McDermott, one of the prosecutors overseeing Fullman's case, "took matters into her own hands" and "join[ed] the police investigation in search of" such a witness from "the Philadelphia Ugly Duckling Car Rental," from where they believed Fullman had rented the car. Fullman avers that ADA McDermott provided further investigative support by aiding the officers in finding a law enforcement witness "with ballistics expertise" to "provide [a] fabricated scientific theory" regarding the bullet mark that Officer Carter claimed to have found at the crime scene.

When Fullman's trial eventually started in June 1987, Fullman alleges that Officer Carter acquiesced and provided false testimony, stating that she observed a "fresh" bullet mark on the street at the crime scene.  She told the jury that she was able to characterize the bullet in such a way based on her experience having identified "hundreds" of similar bullet marks during her

training at the Philadelphia Police Academy. Fullman avers that ADA McDermott was aware

that this testimony was false, but presented it to the jury nonetheless. Beatty also took the stand,

and, in contrast to his testimony at the Preliminary Hearing—where he testified that he observed

a bullet mark on the sidewalk of the crime scene following the incident—claimed that he saw the

bullet mark on the street in an effort "to corroborate his story" with that of Officer Carter.

Ultimately, Fullman was convicted and "spent over five and a half years in prison and an

additional four and a half years" on parole.

　　At some point while Fullman was on parole, he ran into Beatty's wife, Barbara, at a local

Popeyes restaurant where she told him that "prior to and after his criminal trial" she and her

husband repeatedly "insisted to the Defendant Officers and McDermott" that Fullman "never

fired a gun" and only "displayed a silver handgun." Yet, Officers Carter and Dorney "failed to

document" any of these interactions or exculpatory statements in the numerous reports they

produced. And none of the three ever disclosed this information to the defense or trial court at

any point during the investigation or subsequent proceedings against Fullman.

　　Fullman also came to learn that "the problems that Defendants Dorney and Carter had

as . . . investigators, many of which were on full display" during prior investigations, "were

common knowledge at the Philadelphia Police Department" and its "most senior leadership." To

that end, Fullman alleges that Officer Carter "was forced to resign from the [Department]" in

1988 due to her "false ballistics" testimony at his trial. Prior to her discharge, Officer Carter

"reportedly admitted" to pressuring Beatty to provide false testimony against Fullman by

instructing Beatty to: (1) "deny having a baseball bat and attacking Mr. Fullman on October 4,

1986, so Mr. Fullman would be arrested instead of Mr. Beatty even though Mr. Beatty admitted

to striking Mr. Fullman's rental car with a baseball bat"; and, (2) change his testimony about

where he observed the "fresh" bullet mark to bolster her testimony (*i.e.*, from the sidewalk to the street).

Fullman worked for several years to compile additional evidence to clear his name,[1] eventually filing a petition for an actual innocence pardon with the Commonwealth of Pennsylvania.  Following a "a review of the evidence, the Pennsylvania Pardon and Parole Board ultimately recommended to" then-Governor Tom Wolf that "Fullman be granted a full pardon." Governor Wolf then granted the petition on the basis that: "(1) Mr. Fullman did not commit the crime for which he was charged; (2) a police officer (Keenan Morris) who attended the same Philadelphia Police Academy had given a sworn affidavit that there are no bullet marks at the Philadelphia Police Academy's shooting range as falsely testified by Defendant Carter; (3) Defendant Carter was discharged from the Philadelphia Police Department and had no ballistic training; and, (4) the state's witness changed his testimony three times."

Fullman avers that he suffered significant "mental distress" as a result of his wrongful conviction.  He was forced to withdraw from the Community College of Philadelphia, lost his job, and was refused several "employment opportunities with good benefits."  While imprisoned, Fullman "endure[d] his mother's death" and contracted "an infectious disease . . . known as *Microbacterium Fortuitum*."  Because the prison's medical staff was not familiar with the disease, let alone any potential courses of treatment, he had to wait until he was on parole to find a specialist at the Thomas Jefferson Hospital of Philadelphia to start treatment.

### B.    Procedural Background

Fullman filed his Original Complaint in the Philadelphia County Court of Common Pleas

---

[1] For instance, Fullman references affidavits that he obtained from two individuals—Lieutenant Edward Egenlauf and Retired Officer Keenan Morris—regarding the structure of the shooting range at the Philadelphia Police Academy, both of which contravene Officer Carter's trial testimony that she had previously identified "hundreds" of "fresh" bullet marks while training at the Academy.

in December 2023.  Three months later, the City removed the case to federal court and filed a

Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Following several

requests made by Fullman to extend the deadlines to respond to the City's Motion, Fullman filed

his First Amended Complaint in May 2024, rendering the City's Motion moot.  The City moved

to dismiss the First Amended Complaint shortly thereafter, which was also denied as moot

following Fullman's successful request for leave to file a Second Amended Complaint.[2]

## II.   LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content

---

[2] Before delving into an analysis of the City's Motion to Dismiss, some housekeeping: Although the Second Amended Complaint contains several claims against Officer Carter, the City asserts that they should be dismissed because Officer Carter is deceased.  To that end, shortly after Fullman filed the Second Amended Complaint, the City served upon Fullman a Suggestion of Death as to Officer Carter pursuant to Federal Rule of Civil Procedure 25(a).  Fullman subsequently filed two motions seeking to substitute Officer Carter with a different party—both of which were denied.

Rule 25(a) states, in relevant part, that "if a party dies and the claim is not extinguished . . . .  [a] motion for substitution may be made by any party."  Fed. R. Civ. P. 25(a)(1).  It further provides that "[i]f the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed."  *Id*.  Importantly, Rule 25(a)(3) also requires that this "statement noting death" be "served pursuant to Rule 5 for parties and pursuant to Rule 4 for nonparties."  *Giles v. Campbell*, 698 F.3d 153, 158 (3d Cir. 2012) (citing Fed. R. Civ. P. 25(a)(3)).  In such cases, Rule 4 is satisfied through service "on the representative or successor of [the] deceased party."  *Id.* (quoting 7C Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 1965 (3d ed. 2007)).

Here, however, the Certificate of Service accompanying the Suggestion of Death states that the City only served the document on Fullman, and *not* on any representative of Officer Carter's estate.  Fullman, for his part, similarly failed to serve his subsequent motions on Officer Carter's estate.  Thus, because neither party properly effectuated service pursuant to Rules 4 and 25(a)(3), their filings are procedurally defective and will be "treat[ed] . . . as nullities."  *Id.* at 159; *see also Bass v. Attardi*, 868 F.2d 45, 50 n.12 (3d Cir. 1989) ("[T]he suggestion of death . . . was deficient because the suggestion was not served on the decedents' successors or representatives as required by Fed. R. Civ. P. 25(a)(1).").

Nonetheless, Fullman has been on notice since September 2024 that his claims against Officer Carter would be dismissed if he did not successfully move to substitute Officer Carter with a proper party.  Because he has not yet done so, his claims against Officer Carter shall be dismissed without prejudice for failure to prosecute.

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id*. at 210-11 (citation omitted). In so doing, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

As Fullman is proceeding *pro se*, his allegations must be construed liberally at this stage. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc*., 704 F.3d 239, 244-45 (3d Cir. 2013)). The "relevant legal principle" therefore will be applied "even when the complaint has failed to name it." *Id.* "Missing details or superfluous material" similarly do not render a *pro se* complaint "unintelligible." *Garrett v. Wexford Health*, 938 F.3d 69, 93-94 (3d Cir. 2019). Indeed, even if it is "vague, repetitious, or contains extraneous information," a *pro se* complaint's language will ordinarily be "plain" in satisfaction of Rule 8 "if it presents cognizable legal claims to which a defendant can respond on the merits." *Id.* (citations omitted).

## III.    DISCUSSION

### A.    Section 1983 Claims

Fullman's federal claims against the City, ADA McDermott, and Officer Dorney arise under 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  To maintain an action under Section 1983, Fullman must plausibly allege a

violation of a right secured by the Constitution or laws of the United States that was committed

by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).

### i.    City of Philadelphia

Starting first with Fullman's *Monell* claim, Fullman argues that the City "is liable for the

misconduct committed by its officers" pursuant to the doctrine of *respondeat superior*.

However, municipalities, like the City, cannot be held vicariously liable under this doctrine for

the federal constitutional or statutory violations of their employees.  *See Monell*, 436 U.S. at 691,

694; *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009).  Instead, municipal

liability under Section 1983 must be predicated on injuries allegedly caused by either: (1) actions

taken by a municipality pursuant to official policies or customs of the municipal entity; or, (2) "a

failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'"

*Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citing *Estate of Roman v. City of Newark*, 914

F.3d 789, 798 (3d Cir. 2019)).

"Plaintiffs that proceed under a municipal policy or custom theory must make showings

that are not required of those who proceed under a failure or inadequacy theory, and vice versa.

Notably, an unconstitutional municipal policy or custom is necessary for the former theory, but

not for the latter, failure or inadequacy theory." *Forrest*, 903 F.3d at 105.  To that end, "[p]olicy

is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with

respect to the action' issues an official proclamation, policy, or edict." *Berg v. Cnty. of*

8

*Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d

Cir. 1996)).  Customs can be shown where the "practices of state officials . . . [are] so permanent

and well settled as to virtually constitute law."  *Id.* (internal quotation omitted).  The plaintiff

must present evidence that an official with "final policy making authority" either "authorized or

acquiesced" in the policy or custom.  *Oaks v. City of Philadelphia*, 59 F. App'x 502, 504 (3d Cir.

2003).  *Monell* imposes "rigorous standards of culpability and causation" for municipal liability,

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997), so "[a]lthough a

policy or custom is necessary to plead a municipal claim it is not sufficient to survive a motion to

dismiss."  *Estate of Roman*, 914 F.3d at 798.  Instead, the policy or custom at issue must be

shown to be the "proximate cause" of the plaintiff's alleged injuries.  *See Kneipp*, 95 F.3d at

1213.  This requires showing an "affirmative link" between the policy or custom and the

particular constitutional violation, *see Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)

(quotations omitted), or that the municipality's conduct was the "moving force" behind the

plaintiff's alleged injuries, *Berg*, 219 F.3d at 276 (quoting *Bryan Cnty.*, 520 U.S. at 404).

Allegations that "simply paraphrase[]" the standard for municipal liability are too vague and

generalized to support a *Monell* claim.  *McTernan v. City of York*, 564 F.3d 636, 659 (3d Cir.

2009).

   Failure or inadequacy claims, on the other hand, require the "equally demanding

requirement of demonstrating" that the proffered shortcoming "amount[s] to deliberate

indifference on the part of the municipality."  *Forrest*, 930 F.3d at 106 (citation omitted).  To

state a claim under this theory, a plaintiff must allege that: (1) municipal policymakers knew that

its employees would confront a particular situation; (2) the situation involved a difficult choice

or a history of employees mishandling the situation; and, (3) the wrong choice by an employee

would frequently cause deprivation of constitutional rights. *Id.* (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). Although this theory of liability "arose in the failure-to-train context," it nonetheless "applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its police officers." *Id.* at 105 (citation omitted).

"Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of" failure or inadequacy claims. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (cleaned up). However, the Supreme Court has "posited" that a single incident may be sufficient to maintain a claim under this theory where it is "so obvious" that the situation will result in a constitutional violation. *Id.* (quoting *City of Canton v. Harris,* 489 U.S. 378, 390 n.10 (1989)); *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011) (To hold a municipality liable under Section 1983 without proof of a pre-existing pattern of violations, "the unconstitutional consequences of failing to train" must be "patently obvious" such that an actual violation of constitutional rights is a "highly predictable consequence" of that failure.); *see also Lundy v. City of Philadelphia*, 2023 WL 4166457, at *3-4 (E.D. Pa. June 23, 2023) (applying framework). In evaluating such claims, the "likelihood that the situation will recur" and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights" are instructive. *Bryan Cnty*, 520 U.S. at 409.

Liberally construing Fullman's Second Amended Complaint, which is required at this stage, *see Vogt*, 8 F.4th at 185, Fullman presents two theories of *Monell* liability: (1) the City had a policy, custom, and practice of fabricating evidence and withholding exculpatory information, thus causing violations of his Fourth and Fourteenth Amendment rights; and, (2) the City failed to train, supervise, and discipline officers who engaged in such conduct, which similarly

infringed upon those constitutional rights.  Evaluating each theory in turn, Fullman's "policy"

allegations fail because he has not pointed to any specific "proclamation, policy, or edict" issued

by a final City policymaker.  *See Berg*, 219 F.3d at 275.  To satisfy the pleading standard for

such allegations, Fullman must "identify [the] custom or policy, and *specify* what exactly that

custom or policy was."  *McTernan*, 564 F.3d at 658 (emphasis added) (citation omitted).   The

Second Amended Complaint, however, simply alleges that Fullman's rights were violated due to

various City's policies, which Fullman describes only in mere general terms.[3]  Without

connecting his allegations to any "official proclamation, policy, or edict issued by a final

policymaker," *Est. of Tyler ex rel. Floyd v. Grossman*, 108 F. Supp.3d 279, 298 (E.D. Pa. 2015),

Fullman's policy claims therefore are not sufficient at this stage in that they "are too vague and

generalized to support a *Monell* claim.  *McTernan*, 564 F.3d at 658-59; *see also Wood v.

Williams*, 568 F. App'x 100, 104 (3d Cir. 2014).

     Fullman's "custom" claims meet a similar fate, as he has not alleged with specificity any

practices that were "so permanent and well settled as to virtually constitute law" such that the

City was put on notice of a constitutional deficiency.  *Berg*, 219 F.3d at 275-76.  Instead, he

predominantly relies on "bald assertions" and one-time acts by ADA McDermott and Officers

Carter and Dorney, which are not the makings of a municipal custom under *Monell*.  *Burke v.

Twp. of Cheltenham*, 742 F. Supp.2d 660, 675 (E.D. Pa. 2010); *cf. Hicks v. City of Philadelphia*,

2023 WL 5278713, at *10 (E.D. Pa. Aug. 16, 2023) (declining to dismiss *Monell* claims where

the plaintiff, *inter alia*, adequately pleaded a "custom of allowing officers to engage in

---

[3] These include:  (1) "taking shortcuts to solve criminal investigations and using untrained officers as ballistics experts, including by fabricating statements, coercing witnesses and withholding exculpatory and impeachment evidence"; (2) "allowing officers and employees to unlawfully prosecute with malicious intent"; (3) indiscriminately and improperly "arrest[ing] citizens without probable cause"; and, (4) "allowing officers and employees to harass, improperly arrest, retaliate, and wrongfully charge individuals in retaliation for being . . .  African-American male[s], homosexual, [and] exercising [their] Second Amendment right to self-defense."

misconduct" by describing "a number of instances in which individual officers . . . fabricated information, a consent decree that led to monitoring reports which specifically referenced a 'code of silence' allowing misconduct to flourish, a narcotics squad that engaged in 'fabrication of search and arrest warrants and other false allegations,' and a Philadelphia City Paper publication that discussed the failure of the Internal Affairs Division to address allegations of misconduct." (citations omitted)); *Alicea v. City of Philadelphia*, 2022 WL 17477143, at *5-6 (E.D. Pa. Dec. 6, 2022) ("The Amended Complaint includes sufficient facts to plausibly show that the City had a custom of acquiescing to widespread unconstitutional actions by the [Philadelphia Police Department]. Specifically, [Plaintiff] alleges the City knew but did not stop the PPD from creating activity sheets without turning them over to attorneys, using coercive language in witness interviews, fabricating inculpatory evidence, and concealing exculpatory evidence. To show the City had the requisite knowledge of these allegedly pervasive actions, [Plaintiff] cites newspaper articles, government investigations, and a number of other cases of police misconduct."). Fullman has not identified any a custom of similar misconduct on the part of the City. Thus, the Second Amended Complaint fails to meet the "rigorous standards of culpability and causation"—even at this stage with all inferences drawn in his favor. *Bryan Cnty.*, 520 U.S. at 405; *Estate of Roman*, 914 F.3d at 795, 798. Accordingly, the City's Motion shall be granted with respect to his policy and custom claims under *Monell*, which shall be dismissed without prejudice.

Nonetheless, Fullman has plausibly stated a failure or inadequacy claim based on single incidents involving the alleged failure to disclose exculpatory evidence, fabrication of evidence, and presentation of false testimony during the proceedings against him—even though he did not explicitly refer to this claim in such terms in the Second Amended Complaint. *See Vogt*, 8 F.4th

12

at 185 ("[W]e apply the relevant legal principle even when the [*pro se*] complaint has failed to name it." (internal citation and quotations omitted)).  As set forth above, Fullman alleges that Beatty recanted his initial statement accusing Fullman of firing the silver handgun at him during the altercation—a fact that Beatty's wife maintains was made known to the City, as she and her husband repeatedly "insisted to the Defendant Officers and McDermott" both "prior to and after [Fullman's] criminal trial" that Fullman "never fired a gun."  Despite being in possession of this exculpatory statement, the Defendant Officers and ADA McDermott neither documented it in any of the several reports they drafted, nor disclosed it to Fullman at any point.  This, argues Fullman, constitutes a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963).

Fullman further avers that the Defendant Officers and ADA McDermott conspired to fabricate evidence and present false testimony in violation of his Fourth and Fourteenth Amendment rights.  Specifically, Fullman points to: (1) Officer Dorney's alleged direction to Officer Carter that she (a) fabricate evidence regarding her observation of a "fresh" bullet mark on the street at the crime scene and, (b) testify falsely at Fullman's trial about her experience having observed "hundreds" of such bullet marks at the Philadelphia Police Academy; (2) Officer Carter's coercion of Beatty to change his testimony from the Preliminary Hearing to the trial regarding the location of the alleged bullet mark (*i.e.*, from the sidewalk to the street) to bolster her theory; and, (3) ADA McDermott's decision to present such testimony, despite being well aware of its falsity.

Against this backdrop, Fullman argues that the City failed to train and "supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those concerning the interviews of witnesses, the preparation of reports, . . . the production of exculpatory evidence," and the presentation of false or perjured testimony.  He also asserts that

the City failed to intervene to prevent the violation of his constitutional rights.  "'Given the . . . frequency with which police' obtain exculpatory evidence and their obligation to collect reliable evidence," Fullman has plausibly stated that at this stage the City's alleged failure to train, supervise, or intervene in this respect constitutes "deliberate indifference to the 'highly predictable consequence' of the violations of criminal defendants' constitutional rights" under the Fourth and Fourteenth Amendment.  *Virgil v. City of Newport*, 2018 WL 344986, at *15 (E.D. Ky. Jan. 9, 2018) (quoting *Connick*, 560 U.S. at 63), *aff'd*, 745 F. App'x 618 (6th Cir. 2018).  In other words, without proper measures in place to ensure that criminal defendants like Fullman receive exculpatory evidence in advance of trial, the risk of injury is "so obvious."  *See, e.g.*, *Prevost v. City of New York*, 2014 WL 6907560, at *7 (S.D.N.Y. Dec. 9, 2014) ("[T]he City's failure to provide adequate training regarding the importance of an exculpatory defense when determining whether probable cause exists carried a 'highly predictable' consequence." (citation omitted)); *Barnett v. City of Chicago*, 2020 WL 4336063, at *4 (N.D. Ill. July 28, 2020) ("At this stage, [Plaintiff's] allegations that the City has a practice of using fabricated evidence in police reports, as evidenced by his experience with . . . officers who stood by without intervening, suffice at the pleading stage to state a *Monell* claim against the City."); *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) ("Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations.").  The same holds true for the presentation of false or perjured testimony.  Fullman has therefore carried his burden at this early stage of the proceedings, and the City's Motion shall be denied in this respect.

### ii.    *ADA Barbara McDermott*

Turning next to Fullman's claims against ADA McDermott, which are premised on allegations that she withheld exculpatory evidence, presented false and perjured testimony, and

14

engaged in malicious prosecution—all of which Fullman submits deprived him of his "constitutional right to a fair trial"—ADA McDermott argues that she is absolutely immune from such claims.

Prosecutors are entitled to absolute immunity from liability under Sections 1983 "for engaging in conduct that serves a quasi-judicial function." *Roberts v. Lau*, 90 F.4th 618, 624 (3d Cir. 2024). To serve such a function, the conduct at issue must be "intimately associated with the judicial phase of the criminal process," such as "initiating a prosecution and . . . presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976). But absolute immunity does not extend to "administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." *Weimer v. Cnty. of Fayette*, 972 F.3d 177, 187 (3d Cir. 2020) (citing *Odd v. Malone*, 538 F.3d 202, 208 (3d Cir. 2008)). Once asserted, "the onus is on the prosecutor to demonstrate 'that absolute immunity should attach to each act he allegedly committed that gave rise to a cause of action.'" *Fogle v. Sokol*, 957 F.3d 148, 160 (3d Cir. 2020) (quoting *Light v. Haws*, 472 F.3d 74, 80 (3d Cir. 2007)). On a motion to dismiss, "that burden is uniquely heavy" because the "conduct triggering absolute immunity" must "clearly appear[ ] on the face of the complaint." *Id*. (citations omitted).

This analysis "has two basic steps, though they tend to overlap." *Id.* at 161. First, it must be "ascertain[ed] just what conduct forms the basis for the plaintiff's cause of action." *Roberts*, 90 F.4th at 625. Second, it must be "determine[d] what function (prosecutorial, administrative, investigative, or something else entirely) that act served." *Id*. This analysis "focuses on the unique facts of each case and requires careful dissection of the prosecutor's actions." *Id*. at 627 (quoting *Odd*, 538 F.3d at 210)). However, the "ultimate analysis is whether a defendant has established absolute prosecutorial immunity from a given *claim*." *Fogle*, 957 F.3d at 161

(emphasis in original).

Here, the Second Amended Complaint alleges that that ADA McDermott "intentionally mishandled" Fullman's criminal trial by "fail[ing] to disclose to the defense and trial court that Mr. Beatty had changed his testimony" and "knowingly present[ing] perjured" and false testimony to the jury from Officer Carter and Beatty.  Taking these allegations as true, ADA McDermott is entitled to absolute immunity with respect to any claims arising from them because "[i]t is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence" and "for using false testimony in connection with a prosecution" so long as "they did so while functioning in their prosecutorial capacity." *Yarris v. Cnty. of Delaware*, 465 F.3d 129, 137, 139 (3d Cir. 2006).  Given that Fullman's allegations in this vein pertain to decisions made by ADA McDermott while she was either preparing for or litigating the trial, her actions are entitled to absolute immunity.  *See Fogle*, 957 F.3d at 164 (collecting cases).  Thus, insofar as Fullman's claims pertain to such conduct, ADA McDermott's Motion shall be granted, and those claims shall be dismissed with prejudice as pleaded against her.  *See USX Corp. v. Barnhart*, 395 F.3d 161, 166 (3d Cir. 2004); *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006); *Dennis v. DeJong,* 867 F. Supp.2d 588, 628-29 (E.D. Pa. 2011).

However, Fullman not only avers that ADA McDermott *presented* false and perjured testimony, but that she also *solicited* such testimony when she "took matters into her own hands" just "days before" Fullman's trial commenced and "join[ed] the police investigation in search of" two witnesses to testify against him.  These witnesses included: (1) an employee at the "Philadelphia Ugly Duckling Car Rental" to "falsely claim that the Ford LTD Mr. Fullman had rented was no longer on their parking lot"—testimony which Fullman maintains was central to

16

undermining his self-defense claim; and, (2) a law enforcement witness "with ballistics expertise" to "provide [a] fabricated scientific theory" regarding the "fresh" bullet mark Officer Carter claimed to have found at the crime scene.

At this point, it cannot be determined whether ADA McDermott enjoys absolute immunity for these actions because of the lack of factual specificity surrounding her precise involvement in the police investigation.  Although ADA McDermott attempts to paint her actions as squarely prosecutorial in nature, the Second Amended Complaint is unclear as to whether she affirmatively "went looking for a new witness to provide false testimony," or was merely interviewing a witness "who ha[d] been located and identified by investigators."  *Roberts*, 90 F.4th at 625, 628.  This distinction is critical, as the Third Circuit recently determined that a prosecutor did not enjoy absolute immunity when he did more than just interviewing a witness and instead "played the detective's role" of "search[ing] for clues and collaboration."  *Id.* at 630 (explaining that the prosecutor did not enjoy absolute immunity when he sought out and approached a "jailhouse informant" to testify against a criminal defendant just one month before the defendant's trial, and "knowingly influenced, enticed, and coerced [that informant] to provide false testimony.").  Since the absolute immunity analysis "requires careful dissection of the prosecutor's actions," *Odd*, 538 F.3d at 210, and ADA McDermott's entitlement to such immunity does not "clearly appear on the face of the complaint," she has not satisfied her "uniquely heavy" burden at this stage.  *See Fogle*, 957 F.3d at 160-61; *see also Carson v. City of Philadelphia*, 2024 WL 2057398, at *2, 4 (E.D. Pa. May 8, 2024) ("[S]ince it is not clear at this stage of litigation whether ADA Desiderio was acting in a prosecutorial or investigative capacity when he interviewed Wylie, the motion to dismiss will be denied as to the claims against him.").  Accordingly, her Motion shall be denied in this respect.

### iii.    *Officer William Dorney*

Like his allegations against ADA McDermott, Fullman claims that Officer Dorney

fabricated false evidence, withheld exculpatory evidence, and engaged in malicious

prosecution—all of which deprived Fullman of his "constitutional right to a fair trial."  In

response, Officer Dorney argues that the "false arrest and malicious prosecution claims brought

in these counts cannot proceed" because probable cause existed for Fullman's arrest after Beatty

gave a statement that Fullman displayed a handgun during the altercation.  Even if it did not

exist, Officer Dorney asserts that he is entitled to qualified immunity for his conduct.

At the outset, Fullman does not bring a false arrest claim in the Second Amended

Complaint, so only his malicious prosecution claim[4] will be evaluated.  To state a Section 1983

claim for malicious prosecution under the Fourth Amendment, "a plaintiff must show: (1) the

defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's

favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted

maliciously or for a purpose other than bringing the plaintiff to justice; and, (5) the plaintiff

suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a

legal proceeding."  *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005).

As a threshold matter, "[w]hether any particular set of facts suggest that an arrest is

justified by probable cause requires an examination of the elements of the crime at issue."

---

[4] Even liberally construed, Fullman does not specify whether his malicious prosecution claim is predicated upon violations of the Fourth or Fourteenth Amendment.  *See Washington v. Hanshaw*, 552 F. App'x. 169, 174 n.3 (3d Cir. 2014) ("Our cases interpreting *Albright* [*v. Oliver*, 510 U.S. 266 (1994)] have suggested that § 1983 malicious prosecution claims may be predicated on constitutional provisions other than the Fourth Amendment, such as procedural due process."); *cf. Vogt*, 8 F.4th at 185 ("[W]e apply the relevant legal principle even when the [*pro se*] complaint has failed to name it." (internal citation and quotations omitted)).  At this stage, the Court need not consider the viability of the Fourteenth Amendment claim because Officer Dorney has only moved to dismiss the Fourth Amendment claim.

*Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005), *abrogated on other grounds by Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295 (3d Cir. 2024); *see also Saintil v. Borough of Carteret*, 2024 WL 3565308, at *6 (3d Cir. July 29, 2024) (applying framework). The Second Amended Complaint, however, is devoid of any reference to the exact crime for which Fullman was arrested.  Without such information, Fullman "fails to plead the facts necessary to permit the inference to be drawn that the criminal proceedings against him were commenced maliciously and/or without probable cause."  *Hughes v. City of Philadelphia*, 2023 WL 4852294, at *3 (E.D. Pa. July 28, 2023); *cf. Mazza v. Tredyffrin Twp.,* 2016 WL 270220, at *3 (E.D. Pa. Jan. 21, 2016) (evaluating the elements of a crime in determining whether probable cause existed to support a malicious prosecution claim); *Lockhoff v. Slonaker*, 2017 WL 2423790, at *13 (E.D. Pa. June 5, 2017) (explaining that "[w]ithout the benefit of an affidavit of probable cause," among other things, it would not be possible as a matter of law to determine whether the arresting officer "had probable cause to initiate criminal proceedings").[5]

Accordingly, Officer Dorney's Motion shall be granted in this respect and Fullman's Fourth Amendment malicious prosecution claim shall be dismissed without prejudice.

### B.    State Law Claims

The City asserts that Pennsylvania's Political Subdivision Tort Claims Act (the "Tort Claims Act") immunizes it Fullman's claims of negligent supervision, *respondeat superior* liability, intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress ("NIED").  *See* 42 Pa. Cons. Stat. § 8541 *et seq.*

---

[5] Because Fullman has failed to sufficiently allege that Officer Dorney violated a constitutional right, the Court does not need to analyze Officer Dorney's argument that he is entitled to qualified immunity for this claim.  *See Wilson v. Russo,* 212 F.3d 781, 792 (3d Cir. 2000).

Under the Tort Claims Act, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. § 8541. The City is a "local agency" covered by the Act's immunity provisions. *See Panas v. City of Philadelphia*, 871 F. Supp.2d 370, 376 (E.D. Pa. 2012). Accordingly, the City enjoys absolute immunity from tort liability under the Tort Claims Act unless Fullman satisfies three statutory requirements. *See Mascaro v. Youth Study Center*, 523 A.2d 1118, 1120-21 (Pa. 1987). First, he must "demonstrate that at common law or by statute one not having an immunity defense available could be held liable for the same harm alleged against the agency." *Id*. at 1121. Second, he must demonstrate that the alleged injury "was caused by the negligent acts of the agency or an employee acting within the scope of his office or duties, excluding acts of crimes, fraud, malice or willful misconduct." *Id*. at 1123. Finally, he must show that the City's actions fall into one of the nine exempted categories of conduct: (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; (8) care, custody, or control of animals; or, (9) sexual abuse. 42 Pa. Cons. Stat. § 8542(b). "Because of the clear intent to insulate [the] government from exposure to tort liability for any of its acts, exceptions carved out by the Legislature from this general rule are strictly construed." *Kiley by Kiley v. City of Philadelphia*, 645 A.2d 184, 185-86 (Pa. 1994).

The City focuses on the third prong of this test and asserts that it is immune under the Tort Claims Act because none of the nine exceptions apply. Fullman's brief contains no case law or discussion in contravention of the City's arguments. Instead, he focuses exclusively on the validity of his claims under Section 1983 and contends that "[s]hould the Court decide to dismiss any state law claims, it should not say nothing of Fullman's Section 1983 claim[s]"

because "Pennsylvania's blanket immunity cannot abrogate [his] Fourteenth Amendment rights." Because Fullman has presented no argument to rebut the City's Motion, he has therefore waived any opposition thereto.  *See Valentin v. Attorney General of U.S.*, 386 F. App'x 279, 282 (3d Cir. 2010).

Accordingly, the City's Motion shall be granted in this respect.  Because further amendment would not cure this threshold legal deficiency and thus be futile, Fullman's negligent supervision, *respondeat superior* liability, IIED, and NIED claims shall be dismissed with prejudice as pleaded against the City.  *See USX Corp.*, 395 F.3d at 166; *Arthur*, 434 F.3d at 204. Fullman's state law claims against ADA McDermott and Officer Dorney can proceed at this stage, however, as they did not seek their dismissal.

## IV.    CONCLUSION

For the foregoing reasons, the City's Motion is granted in part and denied in part. Fullman's Section 1983 and state law claims against Officer Carter shall be dismissed without prejudice for failure to prosecute.  Insofar as Counts I-VI (denial of due process; malicious prosecution; fabrication of false evidence; supervisory liability; failure to intervene; and, conspiracy to deprive constitutional rights) pertain to ADA McDermott's alleged failure to disclose exculpatory evidence and use of false or perjured testimony, those claims shall be dismissed with prejudice as pleaded against her.  Fullman's malicious prosecution claim under the Fourth Amendment (Count II) is dismissed without prejudice as pleaded against Officer Dorney, while his *Monell* claim against the City regarding municipal policies and customs (Count VII) shall also be dismissed without prejudice.  Finally, Fullman's state law claims brought in Counts VIII-XI—negligent supervision, *respondeat superior* liability, IIED, and NIED—shall be dismissed with prejudice as pleaded against the City.

Fullman's remaining Section 1983 claims against Officer Dorney (Counts I, II under the

Fourteenth Amendment, and III-VI) and ADA McDermott (Counts I-VI insofar as they pertain to her involvement in the police investigation); his state law claims against Officer Dorney and ADA McDermott; his *Monell* claim against the City regarding single-incident liability; and, any claims against the John Doe Defendant[6] may all proceed at this stage.

An appropriate order follows.

**BY THE COURT:**

*S/* **WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, J.**

---

[6] Fullman has not yet identified the "John Doe (PPD Police Supervisor)" and the City has not moved to dismiss any counts against it. Although "[t]he case law is clear that" an action "cannot be maintained solely against Doe defendants," such defendants "are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed." *Hindes v. FDIC*, 137 F.3d 148, 155 (3d Cir. 1998) (citations omitted). However, "[f]ictitious parties must eventually be dismissed if discovery yields no identities." *Id.* Since the 90-day service window under Rule 4(m) has expired and the fact discovery window has been closed since October 7, 2024, Fullman is hereby on notice pursuant to Rule 4(m) that he must identify and serve this John Doe Defendant by February 14, 2025 or otherwise face dismissal of all such claims.